TALLY EDDINGS, M.D., Plaintiff v. SOUTHERN ORTHOPEDIC AND MUSCULOSKELETAL ASSOCIATES, P.A., Defendant

No. COA00-1197

(Filed 4 December 2001)

**1. Appeal and Error— appealability—order denying arbitration—immediately appealable**

An order denying arbitration is interlocutory but immediately appealable because it involves a substantial right (the right to arbitrate) which might be lost if appeal is delayed.

**2. Arbitration and Mediation— physician's employment contract—interstate commerce—Federal Act**

An arbitration provision in a physician's employment contract was governed by the Federal Arbitration Act where plaintiff was practicing as an orthopedic surgeon in Tennessee when he came to interview with defendant, plaintiff left his practice in Chattanooga and began practicing in North Carolina, and the agreement included a covenant not to compete which prevented plaintiff from practicing in portions of South Carolina and Tennessee. Such a transaction clearly involves interstate commerce under the Act.

**3. Arbitration and Mediation— Federal Act—attack on contract rather than arbitration clause—arbitration required**

The trial court erred by refusing to enforce an arbitration agreement in a physician's employment agreement governed by the Federal Arbitration Act where the grounds upon which the trial court based its refusal went to the entire contract and not to the arbitration agreement. Claims which are an attack on the formation of the contract generally rather than only

on an arbitration clause are required by the FAA to be heard by an arbitrator.

Judge GREENE dissenting.

Appeal by defendant from order entered 30 June 2000 by Judge James U. Downs in Buncombe County Superior Court. Heard in the Court of Appeals 11 September 2001.

*Kelly & Rowe, P.A., by E. Glenn Kelly, for plaintiff-appellee.*

*McGuire, Wood & Bissette, P.A., by T. Douglas Wilson, Jr., and Joseph P. McGuire, for defendant-appellant.*

CAMPBELL, Judge.

Defendant Southern Orthopedic and Musculoskeletal Associates, P.A. ("SOMA") appeals from the trial court's grant of plaintiff's motion to stay arbitration and denial of defendant's motion to compel arbitration and dismiss plaintiff's complaint.

The record discloses that in the fall of 1997, plaintiff, an orthopedic surgeon in Chattanooga, Tennessee, interviewed for an employment position with Asheville Orthopedic Associates ("AOA"),[1] a professional association comprised of four orthopedic surgeons. During his interview, plaintiff primarily dealt with Don Mullis, M.D. ("Mullis"), President of AOA. During the course of negotiations, plaintiff was advised by Mullis that AOA was going to merge into SOMA in the near future, and that Mullis was going to become President of SOMA and a member of SOMA's Board of Directors. Plaintiff was also advised by Mullis that plaintiff had to sign an employment contract with AOA in order to subsequently become employed by SOMA.

On 16 November 1997, plaintiff signed an initial employment contract with AOA, which included a separately signed handwritten addition that read as follows:

It is my understanding that this contract is null and void after the SOMA contract is signed and in effect.

On 3 December 1997, plaintiff signed the Non-Shareholder Physician Employment Agreement with Southern Orthopedic ("SOMA Employment Agreement"), which was to become effective

---

1. AOA is one of five medical practices that subsequently merged into defendant SOMA.

on 1 January 1998. The SOMA Employment Agreement contained the following arbitration clause:

> (10) Dispute Resolution by Arbitration. Any controversy, dispute or disagreement arising out of or relating to this Agreement, including the breach thereof, shall be settled exclusively by binding arbitration, which shall be conducted in a location to be mutually agreed upon by the parties, or at the principal office of the corporation, in accordance with the National Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration, and which to the extent of the subject matter of the arbitration, shall be binding not only on all parties to this Agreement, but on any other entity controlled by, in control of or under common control with the party to the extent that such affiliate joins in the arbitration, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Any arbitrator so appointed shall have the express authority, but not the obligation, to award attorney fees and expenses to the prevailing party in such proceeding.

In addition, the SOMA Employment Agreement contained a termination provision that required plaintiff to provide written notice of his resignation no less than 180 days prior to the date of termination. Exhibit 3A of the SOMA Employment Agreement further required that plaintiff give preliminary written notice of resignation twelve (12) months prior to the effective date of termination. Exhibit 3A also contained a covenant not to compete which precluded plaintiff from engaging in the practice of orthopedic surgery within a fifty-mile radius of the AOA Care Center for a period of five years following termination of his employment. Upon breach of this covenant not to compete, plaintiff was required to pay SOMA $120,000.00.

On 17 July 1998, plaintiff signed the Southern Orthopedic Care Center Agreement ("Care Center Agreement") which contained an arbitration clause similar to the one in the SOMA Employment Agreement. The Care Center Agreement was signed by Mullis, as President of SOMA, on 10 August 1998, and plaintiff began working as an orthopedic surgeon for SOMA on 17 August 1998.

Plaintiff worked as an orthopedic surgeon for SOMA from 17 August 1998 until 4 January 2000. By letter dated 4 January 2000, plaintiff immediately terminated his employment with SOMA, citing the following reasons:

1. Misrepresentation of all contracts including the Asheville Orthopedic Associates contract, the SOMA employee contract, and the Care Center Agreement. These contracts fail to reflect the future purchase shares in SOMA. I, along with other recent employees, was recruited with the promise of "no buy in." It is now clear from other SOMA documents that there was always a share purchase intended and that the senior partners of AOA knew about these shares, and willfully misrepresented the contracts.

2. The failure of management to address concerns brought to their attention in good faith concerning the above. My other concerns including expenses have also been repeatedly ignored.

3. There is ample evidence that since my one-year anniversary that I have not been wanted in the office. This includes the repeated statements to other physicians in my office by Don Mullis, President of SOMA, that "Tally will never be a shareholder of SOMA." This is further illustrated by his refusal to provide medical care to established patients in my practice in my absence. He also has refused to talk to me since October 1999.

4. Continued recruitment for physicians in our care center in spite of a November meeting in which it was decided by AOA to cease all recruiting efforts. This represents the managements' willingness to take only themselves into consideration when making any decision.

5. The inability to ever become a property owner.

6. The current valuation and financing of shares offered.

Plaintiff's letter of resignation was intended to serve as his twelve-month notice pursuant to the termination provision found in Exhibit 3A of the SOMA Employment Agreement. However, this letter of resignation clearly violated the notice of termination provision.

Following his resignation from SOMA, plaintiff began practicing with Blue Ridge Bone & Joint Clinic, P.A., a competing orthopedic practice in Asheville, in violation of the covenant not to compete contained in Exhibit 3A of the SOMA Employment Agreement. On 25 February 2000, SOMA filed a request for arbitration with the American Health Lawyers Association in an attempt to resolve its dispute with plaintiff. Specifically, SOMA claimed that plaintiff had breached the SOMA Employment Agreement (1) by failing to give

timely notice of his resignation, (2) by breaching the covenant not to compete, and (3) by breaching the duty of loyalty he owed SOMA by referring business to his new employer.

Rather than submit to binding arbitration, plaintiff filed the complaint in the instant case on 9 March 2000, seeking rescission of the SOMA Employment Agreement on the basis of fraud and breach of fiduciary duty. Specifically, plaintiff alleged that SOMA and its agents fraudulently misrepresented and concealed facts concerning the formula to be used in computing plaintiff's compensation, thereby inducing plaintiff to sign the employment contracts with SOMA. Plaintiff also sought a stay of the arbitration proceeding initiated by SOMA, as well as a declaratory judgment that no enforceable employment contract existed between the parties. In addition, plaintiff sought damages for fraud, unfair and deceptive trade practices, and *quantum meruit*. Plaintiff subsequently amended his complaint to add a claim seeking a declaratory judgment that the SOMA Employment Agreement was unconscionable and against public policy.

SOMA filed a motion to dismiss plaintiff's complaint and compel arbitration of all the matters alleged in the complaint. Plaintiff filed a motion to stay arbitration pursuant to N.C. Gen. Stat. § 1-567.3(b), which provides:

(b) On application, the court may stay an arbitration proceeding commenced or threatened on a showing that there is not an agreement to arbitrate. Such an issue, when in substantial and bona fide dispute, shall be forth with and summarily tried and the stay ordered if found for the moving party. If found for the opposing party, the court shall order the parties to proceed to arbitration.

N.C. Gen. Stat. § 1-567.3(b) (2000).

On 30 June 2000, after reviewing plaintiff's complaint and the affidavits presented by SOMA, the trial court entered an order granting plaintiff's motion to stay arbitration and denying SOMA's motion to compel arbitration and dismiss plaintiff's complaint. The trial court concluded that plaintiff's contracts with SOMA—both the initial contract with AOA and the SOMA Employment Agreement—were procured by fraud, and, therefore, all provisions of the two agreements, including the arbitration clause in the SOMA Employment Agreement, were void. Thus, the trial court concluded that plaintiff was not required to submit his claims against SOMA to binding arbi-

tration. The trial court further concluded that the SOMA Employment Agreement was so vague and indefinite, and subject to amendment at any time by SOMA, that there was no meeting of the minds between plaintiff and SOMA, and, thus, all of its provisions were unenforceable. The court also concluded that the SOMA Employment Agreement was so unconscionable that it should not be enforced. In addition to denying SOMA's motion to compel arbitration, the trial court ordered immediate dismissal of the request for arbitration filed by SOMA on 25 February 2000. From this order, SOMA appeals. For the following reasons, we reverse the decision of the trial court.

[1] As an initial matter, we note that the trial court's order is interlocutory because it fails to resolve all issues between all parties in the action. *Howard v. Oakwood Homes Corp.*, 134 N.C. App. 116, 118, 516 S.E.2d 879, 881 (1999). While interlocutory orders are generally not immediately appealable, this Court has consistently held that an order denying arbitration is immediately appealable because it involves a substantial right—the right to arbitrate a claim—which may be lost if appeal is delayed. *Martin v. Vance*, 133 N.C. App. 116, 119, 514 S.E.2d 306, 308 (1999); *Burke v. Wilkins*, 131 N.C. App. 687, 688, 507 S.E.2d 913, 914 (1998).

[2] A threshold question we must answer before analyzing the trial court's order is whether state or federal law governs. Both state and federal statutes address the validity and effect of arbitration provisions. The Federal Arbitration Act ("FAA") provides:

> A written provision in any maritime transaction or a *contract evidencing a transaction involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (1999) (emphasis added).

Similarly, the Uniform Arbitration Act, Article 45A of the North Carolina General Statutes, provides, in pertinent part:

> (a) Two or more parties may agree in writing to submit to arbitration any controversy existing between them at the time of the agreement, or they may include in a written contract a provision

for the settlement by arbitration of any controversy thereafter arising between them relating to such contract or the failure or refusal to perform the whole or any part thereof. Such agreement or provision shall be valid, enforceable, and irrevocable except with the consent of all parties, without regard to the justiciable character of the controversy.

N.C. Gen. Stat. § 1-567.2(a) (2000).

The distinction between the FAA and the Uniform Arbitration Act is that the FAA only applies to maritime transactions and "contracts evidencing a transaction involving commerce." 9 U.S.C. § 2. The arbitration provision at issue in the case *sub judice* clearly has no relation to a maritime transaction; therefore, we must determine whether the SOMA Employment Agreement evidences a transaction involving commerce within the meaning of the FAA.

The FAA defines commerce broadly as "commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation . . . ." 9 U.S.C. § 1. Thus, for the FAA to apply, the contract must involve interstate or foreign commerce.

In *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 130 L. Ed. 2d 753 (1995), the United States Supreme Court addressed the question of whether Section 2 of the FAA was intended to reach to the limits of Congress' Commerce Clause powers, or whether the phrase "a contract *evidencing* a transaction *involving* commerce," 9 U.S.C. § 2 (emphasis added), was intended to restrict the Act's application. The Court began by restating the basic purpose behind the FAA to overcome courts' refusals to enforce agreements to arbitrate and to place arbitration agreements on the same footing as other contracts. *Allied-Bruce*, 513 U.S. at 270-71, 130 L. Ed. 2d at 762. The Court then reaffirmed its earlier decision in *Southland Corp. v. Keating*, 465 U.S. 1, 79 L. Ed. 2d 1 (1984), where the Court held that the FAA is federal substantive law which is fully applicable in state courts and preemptive of state laws hostile to arbitration. The Court then turned to interpreting the phrase "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2.

The Court first focused on the words "involving commerce," and concluded that these words are broader than the often-used words of

art "in commerce." *Allied-Bruce*, 513 U.S. at 273, 130 L. Ed. 2d at 764. Therefore, the Court concluded, the words "involving commerce" cover more than persons or activities within the flow of interstate commerce. *Id.* (citing *U.S. v. American Bldg. Maintenance Industries*, 422 U.S. 271, 276, 45 L. Ed. 2d 177, 183 (1975) (quoting *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195, 42 L. Ed. 2d 378, 386-87 (1974)) (defining "in commerce" as related to the "flow" and defining the "flow" to include "the generation of goods and services for interstate markets and their transport and distribution to the consumer"). The Court then considered how far beyond the flow of commerce the word "involving" actually reached. The Court ultimately concluded that the phrase "involving commerce" was functionally equivalent to the phrase "affecting commerce," and signaled Congress' intent to exercise its Commerce Clause powers to the full. *Id.* at 274, 130 L. Ed. 2d at 764.

The Court then turned to interpreting the phrase "evidencing a transaction," and concluded that it meant "that the transaction (that the contract "evidences") must turn out, *in fact*, to have involved interstate commerce[.]" *Id.* at 277, 130 L. Ed. 2d at 766 (emphasis in original). In so holding, the Court rejected an alternative interpretation of the phrase "evidencing a transaction," which focused on the contemplation of the parties at the time they entered into the contract—specifically whether the parties contemplated substantial interstate activity. In rejecting this "contemplation of the parties" interpretation, the Supreme Court called into question the decisions of several federal district courts and state courts, including the North Carolina Supreme Court's decision in *Board of Education v. Shaver Partnership*, 303 N.C. 408, 279 S.E.2d 816 (1981) (applying the "contemplation of the parties" interpretation). In summary, the United States Supreme Court in *Allied-Bruce* concluded that Section 2 of the FAA extends to the limits of Congress' Commerce Clause powers, and in order to come within the scope of Section 2 of the FAA, the contract in question must evidence a transaction that in fact involves interstate commerce.

Applying the principles set forth in *Allied-Bruce* to the case *sub judice*, we hold that the SOMA Employment Agreement falls within the scope of the FAA. Plaintiff in the instant case was practicing as an orthopedic surgeon in Chattanooga, Tennessee, when he came to North Carolina to interview with AOA and entered into negotiations concerning possible future employment with SOMA. The SOMA Employment Agreement evidences a transaction—the creation of the

employer-employee relationship between plaintiff and SOMA—by which plaintiff left his practice in Chattanooga and crossed state lines to begin practicing in North Carolina. Such a transaction clearly involves interstate commerce.[2] Therefore, we hold that the arbitration provision in the SOMA Employment Agreement is governed by the FAA.[3]

[3] Having determined that the arbitration provision in the SOMA Employment Agreement is governed by federal law pursuant to the FAA, we must analyze the trial court's order to determine whether it is sufficient to support its refusal to enforce the parties' arbitration agreement. In so doing, we keep in mind that the only limitation on the enforceability of arbitration provisions that are governed by the FAA is that they may be revoked "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

The trial court based its conclusion that the parties' arbitration agreement was not enforceable on the following three grounds: (1) the SOMA Employment Agreement was procured by fraud, (2) the terms of the SOMA Employment Agreement are so unconscionable that it should not be enforced, and (3) the SOMA Employment Agreement is so vague and indefinite, and subject to amendment by SOMA, that it was not the product of a valid meeting of the minds between the parties.

SOMA first argues that a claim of fraud in the inducement of the contract generally—as opposed to the arbitration provision specifically—is an issue to be resolved by an arbitrator and not by the courts. SOMA's argument on this issue is based on the United States Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin*, 388 U.S. 395, 18 L. Ed. 2d 1270 (1967), where the Court held, with respect to cases brought in federal court that are governed by the FAA, a claim for fraud in the inducement of the arbitration clause

---

2. We also note that the covenant not to compete contained in the SOMA Employment Agreement prevents plaintiff from practicing orthopedic surgery within a fifty-mile radius of Asheville. By preventing plaintiff from practicing in portions of Tennessee and South Carolina, this covenant not to compete also impacts on interstate commerce.

3. We further note that Section 1 of the FAA, which excludes from the Act's coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, does not exempt the SOMA Employment Agreement from coverage under the Act. The United States Supreme Court recently addressed this issue in *Circuit City Stores, Inc., v. Adams*, 532 U.S. 105, 149 L. Ed. 2d 234 (2001), and held that the exemption contained in 9 U.S.C. § 1 only applies to contracts of employment for transportation workers.

itself is an issue for the federal court to adjudicate, whereas a claim for fraud in the inducement of the entire contract is an issue to be referred to arbitration. In light·of the Supreme Court's holding in *Southland Corp.* that the FAA is federal substantive law applicable in state courts, we hold that the reasoning in *Prima Paint* applies equally in the present case.

Plaintiff did not allege in his complaint that SOMA fraudulently induced him to enter into the agreement to arbitrate contained in the SOMA Employment Agreement. Rather, plaintiff's allegations of fraud are directed at the entire SOMA Employment Agreement. Based on *Prima Paint*, we hold that the issue of fraudulent inducement of the entire contract should have been submitted to arbitration. *But see Paramore v. Inter-Regional Financial,* 68 N.C. App. 659, 316 S.E.2d 90 (1984) (recognizing a contrary rule under the State's Uniform Arbitration Act).

SOMA next argues that plaintiff's claim that the SOMA Employment Agreement is an unconscionable contract must also be determined by an arbitrator. Where such claims are an attack on the formation of the contract generally, rather than just the arbitration clause itself, the FAA requires that the claims be heard by an arbitrator. *See Rojas v. TK Communications, Inc.,* 87 F.3d 745, 749 (5th Cir. 1996). Here, plaintiff's claim of unconscionability is not directed towards the arbitration provision itself, but rather the entire contract. Therefore, it is an issue for arbitration.

The final ground upon which the trial court based its refusal to enforce the parties' arbitration agreement is that the SOMA Employment Agreement is so vague and indefinite, and subject to amendment by SOMA at any time, that there was no meeting of the minds between the parties. As with the previous two issues, plaintiff's allegations concerning this issue go to the entire contract and not the arbitration agreement itself. Plaintiff does not specifically contend that there was no meeting of the minds between the parties concerning the arbitration agreement itself. Furthermore, it is undisputed that plaintiff signed the SOMA Employment Agreement certifying his willingness to submit "any controversy, dispute or disagreement arising out of or relating to [the SOMA Employment Agreement]" to binding arbitration. Plaintiff's execution of the SOMA Employment Agreement charges him with knowledge and assent to its contents, including the arbitration provision. *Martin,* 133 N.C. App. at 121, 514 S.E.2d at 309-10 (citing *Biesecker v. Biesecker,* 62 N.C. App. 282, 302 S.E.2d 826 (1983)).

In summary, we hold that a valid agreement to arbitrate exists between plaintiff and SOMA and that the grounds relied upon by the trial court in refusing to enforce this arbitration agreement are issues which are covered by the language of the parties' agreement to arbitrate and must be submitted to an arbitrator.

Accordingly, we reverse the trial court's grant of plaintiff's motion to stay arbitration and denial of SOMA's motion to compel arbitration and dismiss plaintiff's complaint, and remand for entry of an order granting SOMA's motion to compel arbitration and dismiss plaintiff's complaint and denying plaintiff's motion to stay the arbitration previously initiated by SOMA.

Reversed and remanded.

Judge BRYANT concurs.

Judge GREENE dissents in a separate opinion.

GREENE, Judge, dissenting.

I agree with the majority that under the Federal Arbitration Act (the FAA), "a claim for fraud in the inducement of the entire contract is an issue to be referred to arbitration." Because I believe, however, that it is impossible for this Court to initially determine whether the transaction in this case involves interstate commerce, thus making the FAA applicable, I respectfully dissent.

Before the FAA applies to a contract, the contract must either relate to a maritime transaction or evidence "a transaction involving commerce." 9 U.S.C. § 2 (2000). Whether a contract "evidenced 'a transaction involving commerce' within the meaning of § 2 of the [FAA]" is a question of fact which an appellate court should not initially decide. *Merritt-Chapman & Scott Corp. v. Pennsylvania Turnpike Comm'n*, 387 F.2d 768, 772 (3d Cir. 1967).

In this case, neither of the parties argue the FAA applies to the SOMA Employment Agreement or the SOMA Employment Agreement evidences "a transaction involving commerce." With the exception of the fact plaintiff was in Tennessee before moving to Asheville to join AOA, there is no evidence in this case that the transaction involved multiple states. Indeed, the record to this Court is devoid of any evidence the SOMA Employment Agreement or plaintiff's employment

"involve[d] interstate commerce and [is] within the scope of the FAA." Although this Court "may speculate on what may have been the nature of the performance required by the contract, it is impossible for us to determine on appeal whether the [FAA] applies" due to the contract in question involving interstate commerce. *See id.* Accordingly, I would remand this case to the trial court for the initial determination of whether the SOMA Employment Agreement involved interstate commerce. If the trial court determines the SOMA Employment Agreement does not involve interstate commerce, state law governs the enforcement of the agreement and, thus, any allegations of fraud are to be determined by the trial court instead of by arbitration. *See Paramore v. Inter-Regional Fin. Group Leasing Co.*, 68 N.C. App. 659, 662-63, 316 S.E.2d 90, 92 (1984) (if the agreement was obtained by fraud, "there would be no contract to enforce by arbitration or otherwise," thus, the validity of the supporting contract should be determined by the courts before proceeding with arbitration).